Peter Bibring, SBN 223981
peter@bibringlaw.com
LAW OFFICE OF PETER BIBRING
2210 W. Sunset Blvd. #203
Los Angeles, CA 90026
(213) 471-2022

*Attorney for Plaintiff*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

THE ESTATE OF RILEY SPICER, by and through its successor-in-interest, DEBORAH E. SPICER; DEBORAH E. SPICER

PLAINTIFFS,

v.

CITY OF LOS ANGELES, a municipal entity; and DOES 1 to 35, in their individual capacities,

DEFENDANTS.

Case No.

**COMPLAINT**

JURY TRIAL DEMANDED

The ESTATE OF RILEY SPICER, by and through its successor-in-interest, DEBORAH SPICER; and DEBORAH SPICER allege and complain as follows:

## INTRODUCTION

1. Riley Matthew Spicer was the kind of person who everyone seemed to know — a magnetic personality who disarmed people with his warmth, openness, and humor. People met him once and felt they knew him. And people remembered him. Riley's family and friends constantly ran into people who knew Riley and had some story about how he had touched their lives with some kindness, or had stories of his wit, often deployed through obscure and absurd references to movies and pop culture, of which he had an encyclopedic command. Riley grew up in a tight-knit family that moved between Arizona and Southern California, the child of single mom and middle brother to two sisters.



In recent years, Riley lived in Los Angles but stayed close with his mother, his sisters, and his nieces.







2. Riley's life had difficulties as well. Riley suffered mental health challenges that he generally managed well but which led to struggles with addiction. Even there, Riley's light shone through. After entering a residential substance abuse program at Beit T'Shuvah in Los Angeles in his late twenties, he became beloved by staff and went on to work there as a patient facilitator and supervisor. He moved on to work in real estate but suffered a relapse in 2025 and had arranged to go back to Beit T'Shuvah's treatment program. But Riley never got that chance.

3. In the early morning hours of August 18, 2025, Riley suffered a mental health crisis at a hotel in Hollywood where he was staying with friends. He closed himself in the hotel room bathroom and began yelling. As his friends tried to reassure him from outside the bathroom, they overheard him call 911 and report that people were

"in his apartment" and "trying to rob him." They called 911 themselves and told the dispatcher that their friend had just called and, while there was no one trying to rob him, he was having a mental breakdown and needed immediate medical assistance. His friends went into an adjoining room, where the bathroom window was close enough to the window of the bathroom where Riley was that they could hear what he was saying and talk with him. One of his friends continued to talk with Riley, trying to calm him. When police officers appeared in the driveway below, Riley's friend spoke with them from the window— he told the officers that the person yelling was named Riley. He said that he had been in the hotel room with Riley but had moved next door to try to talk with him and calm him down. He told them Riley was a good person who was having a mental breakdown and needed help. He told them Riley was unarmed.

4. In the front of the hotel, a very different scene played out as officers from the Los Angeles Police Department ("LAPD") responded to the 911 calls. Unit after unit arrived until about ten officers stood on the balcony walkway outside the door of Riley's hotel room. Officers pounded on the door yelling at Riley repeatedly to "come out with your hands up" and shouting, "If you have any weapons, you're going to get shot." Although the LAPD has specialized units trained to deal with mental health crises, no such units responded. And although Riley was clearly suffering a mental health crisis as he audibly screamed from the bathroom — and as Riley's friends told officers directly — LAPD nonetheless treated Riley as a criminal suspect. After obtaining a key from management, they kicked the door of Riley's room open. They yelled again into the room that Riley must come out with his hands up, and that if he had any weapons, he would be shot.

5. Officers then entered Riley's room. There was a loud bang. The officers backed to the door of the room, coughing. There was another loud bang, and another. Over the next several minutes, the LAPD officers stood at the door, continuing to yell at Riley as the room filled with an odd-colored smoke. Officers twice began to re-enter but quickly backed out, coughing, as Riley continued to yell from the bathroom. Officers

called for a body shield. They waited to obtain one and then entered the room again, nearly eight minutes after their first entry. A minute later, officers carried Riley's limp body from the bathroom to the balcony walkway. Officers performed CPR for barely two minutes before declaring he had no pulse, stopping CPR, and carrying Riley's unconscious form down to the street, where they put him on the gutter of Sunset Boulevard, on his side, handcuffed.

6. Paramedics reported finding Riley without a pulse when they began treating him. They transported Riley to the hospital where doctors declared him dead, less than ninety minutes after he called 911 for help.

7. What exactly happened during the nine minutes between when LAPD officers first entered the room and when they carried Riley out, only Defendants know for certain at this point. Riley's mother, Plaintiff Deborah Spicer, has made repeated requests to LAPD for information about what happened, including requests to view body camera video of the officers in the hotel. LAPD has to date denied her access to body camera video and refused to provide her any further information.

8. Upon information and belief, LAPD officers deployed tear gas or other chemical agent or smoke device intended to incapacitate or subdue Riley, which ended up killing him instead.

9. Whatever LAPD officers did in Riley's hotel room, they unquestionably responded to pleas for help for man they knew was in mental health crisis by treating him as a criminal threat. They did not de-escalate. They used tactics that any competent officer would know — and that LAPD policy makers certainly knew — were likely to escalate and exacerbate a mental health crisis, not resolve it, and posed serious risks to Riley's health and safety. They engaged in these aggressive tactics with deliberate indifference to the risks to Riley. As a result, a man who called the police in need of help died within minutes of their arrival.

## JURISDICTION AND VENUE

10. This is an action for violations of Plaintiffs' federal and state constitutional

and statutory rights. Jurisdiction exists pursuant to 28 U.S.C. §§ 1331 and 1343 as Plaintiffs assert claims under 42 U.S.C. § 1983. The Court has supplemental jurisdiction to consider Plaintiffs' state law claims under 28 U.S.C. § 1367, as these state law claims arise from the same common nucleus of operative facts as Plaintiffs' federal claims.

11. Venue is proper in the Western Division of the Central District of California pursuant to 28 U.S.C. § 1391(b) because the events and conduct giving rise to Plaintiffs' claims all occurred in the City of Los Angeles, Decedent Riley Spicer resided in the City of Los Angeles, and defendant City of Los Angeles is located in the division.

12. Plaintiff has complied with the requirements of the California Government Claims Act, Cal. Gov't Code §§ 810 *et seq*.

## **PARTIES**

13. At all times relevant to this complaint, and at the time of his death, decedent Riley Matthew Spicer ("Riley" or "Mr. Spicer") was an individual residing in Los Angeles County, California.

14. Riley was not married at the time of his death and had no children.

15. Deborah E. Spicer is Riley Spicer's mother and is the executor and sole beneficiary of Riley Spicer's will. Deborah Spicer is therefore Riley's successor-in-interest under California law. She properly brings this action on behalf of the Estate of Riley Spicer pursuant to § 377.30 of the California Code of Civil Procedure, as set forth in the Declaration of Deborah E. Spicer, attached as Exhibit 1. Deborah Spicer is a resident of Orange County, California.

16. Defendant City of Los Angeles (the "City") is a municipal corporation duly organized and existing under the Constitution and laws of the State of California. The Los Angeles Police Department ("LAPD") is an agency of Defendant City and all actions of the LAPD are the legal responsibility of the City. At all relevant times, Defendant City was responsible for the actions, omissions, policies, procedures, practices, and customs of its various agents and agencies, including LAPD, and assuring that the actions, omissions, policies, practices, and customs of the LAPD and its

employees and agents complied with the laws of the United States and the State of California.

17. Plaintiff is ignorant of the true names and capacities sued herein as Does 1 through 35, inclusive, and therefore sue these Defendants by such fictitious names. Plaintiff will amend to allege their true names and capacities when ascertained.

18. Upon information and belief, Does 1 through 16 are LAPD officers who responded to the hotel where Riley died and who participated in the decisions and actions that led to his harm and death.

19. Upon information and belief, Does 17 to 20 are dispatchers who responded to 911 calls coming from the hotel, or to calls from LAPD units, and failed to gather or convey to responding units important information that would indicate Riley was in a mental health crisis, or otherwise guide responding officers.

20. Upon information and belief, Does 21 to 25 are LAPD officers and supervisors who participated in, approved, directed, or ratified the decisions of individual LAPD officers in the violations of Plaintiffs' rights alleged below.

21. Plaintiff is informed, believes, and thereupon alleges that Does 26 though 35 are LAPD commanders and executives, and/or other employees, agents, and servants of the City who formulated, established, approved, or ratified the agency's policies, training, custom, and practice on responding to calls for individuals exhibiting signs of mental health crisis, that led to the decisions of individual LAPD officers in the violations of Plaintiffs' rights alleged below.

22. At all relevant times, City of Los Angeles was the employer of the Doe Defendants, and the Doe Defendants were acting under color of law within the course and scope of their duties as deputies and officials for the City. In acting and failing to act as alleged herein, the Doe Defendants were acting with the complete authority, permission, and ratification of their principal, Defendant City of Los Angeles.

23. Plaintiff is informed and believes and thereon alleges that at all times relevant herein, each of the Defendants was the agent, employee, servant, joint venturer,

partner, and/or co-conspirator of the other Defendants named in this Complaint and that at all times, each of the Defendants was acting within the course and scope of said relationship with the other Defendants.

## FACTUAL ALLEGATIONS

### A. Riley's Mental Health Crisis and Death

24. The allegations in this complaint are made on information and belief, based on the information available to Plaintiffs at the time.

25. On about the late evening of August 17 or early August 18, 2025, Riley checked into a room of the Hollywood Guest Inn at 6700 W. Sunset Blvd., Los Angeles, CA 90028, with some friends. The hotel is built with rooms facing an internal courtyard. Riley's room was on the second floor and could be accessed by walking up an outdoor staircase to a covered balcony that ran along the second floor leading to the doors to each room.

26. At some point in the early morning hours of August 18, Riley began to exhibit signs of paranoia, expressing concern that people might be trying to hurt him. His friends reassured him and he appeared to calm down.

27. At some point, Riley entered the bathroom alone to take a shower. After he had been alone in the bathroom for some time, Riley began shouting and pounding on the bathroom door, asking loudly why people were in his apartment. Riley's friends spoke to him through the door and tried to comfort him, reminding him they were in a hotel room and assuring him there was no one there trying to hurt him.

28. At shortly before 5 a.m., Riley called 911 and reported that people were in his apartment and trying to rob him. Riley's friends overheard Riley calling through the bathroom door. Concerned, they called 911 themselves and explained to the dispatcher that they were with a friend who had just called 911 from the hotel, that he was experiencing some sort of psychosis or breakdown, and that he needed medical assistance quickly.

29. Upon information and belief, LAPD dispatched units to the hotel and coded

the call as a disturbance of the peace, without reference to mental health needs.

30. Riley's friends then went into an adjoining room. The bathroom of the adjoining room had a window adjacent to the window of the bathroom where Riley was. The proximity of the two windows made it easier to hear and speak to Riley than it was through the door of the hotel room. One of Riley's friends went to the window to talk to Riley and try to calm him. Riley continued to seem agitated and repeatedly called for help.

31. The bathroom windows overlooked an alley or driveway behind the hotel. At some point, about four to five LAPD officers appeared in the driveway below. Riley's friend spoke with the officers. He told them his name and told them he was a friend of the person who was yelling. He told the officers that the person's name was Riley, that he was a good person but was going through it and having some sort of meltdown. He told the officers that he had been in a room together with Riley, but was now in the next room over so that he could talk to Riley. He told the officers that Riley was unarmed. He told them Riley was alone in the room, and that he was scared.

32. The officers in the driveway behind the hotel heard Riley's friend talking to Riley. Several times they repeated what he was saying – when Riley's friend told him that officers were there to help him, they repeated, "Yes, Riley. We're here to help."

33. While Riley's friend was trying to talk to him and calm him through the bathroom windows, a very different scene was playing out at the front door to Riley's room.

34. At shortly after 5 a.m., LAPD officers Doe 1 and Doe 2 arrived at the hotel. They spoke briefly to a hotel guest who said she had called 911. They told her to go back to her room, and she entered room next door to Riley's, where Riley's friends were speaking to him from the bathroom. Officer Doe 1 also spoke briefly to the hotel manager. Upon information and belief, Officer 2 was armed with a 40mm less-lethal launcher. Another pair of LAPD officers, Does 3 and 4 arrived. They conferred briefly with Does 1 and 2, and discussed that if the subject of the call was only harming

themselves they would not be arrested. The four proceeded up a flight of stairs and out to the balcony walkway outside Riley's room.

35. Officer Doe 1 knocked loudly on Riley's door and yelled that he was from the Los Angeles Police Department and, "Come out with your hands up!" When the door did not open, Officer Doe 1 again knocked and yelled, "Los Angeles Police Department. Come out with your hands up!" Officers waited then knocked again, yelling that they were police and that they could not "assist" from outside.

36. Officers Does 1-6 descended the stairs again. They discussed hearing Riley screaming and whether there was a way around the back of the room. Upon information and belief, at least one officer then proceeded to the back driveway, where they could hear Riley and Riley's friend through the windows.

37. Several officers, including Does 1 and 2, returned to the second-floor walkway outside Riley's room. Officer 1 used a room key to open the lock, then swiftly kicked the door wide open and again shouted, "Los Angeles Police Department. Come out with your hands up." A few seconds later, he again shouted an order to "come out with your hand up" and added, "If you have any weapons, you're going to get shot."

38. At about this point, officers on the scene called for a backup air unit and supervisor on a screaming man, and indicated to dispatchers that they intended to break down the door.

39. The officers began entering Riley's room through the open door.

40. The was a loud noise or bang, and the officers backed out of the room and stood just outside the doorway. One of the officers began coughing. Officer 1 continued to yell commands to "come out with your hands up." One or two more bangs may have sounded.

41. Upon information and belief, at approximately this point, LAPD officers deployed tear gas or other chemical agent into the room, in an attempt to incapacitate Riley.

42. Four more officers, Does 7 through 10, arrived on the scene. Upon

information and belief, Doe 10 is an LAPD supervisor who remained in the hotel courtyard below to supervise. Does 7 to 9 joined the others on the balcony walkway outside Riley's room.

43. At some point, about five additional officers, Does 11 to 15, arrived in the driveway behind the hotel, under the windows of the bathroom where Riley was and the adjoining bathroom where his friend was talking to him. Upon information and belief, at least eight LAPD patrol vehicles responded to the call, with sixteen officers and supervisors.

44. Several officers standing outside Riley's room began coughing.

45. Over the next several minutes, the officers re-entered Riley's room twice, and both times backed out, with officers coughing. Smoke or gas was visible in the room. Officers continued repeatedly yelling at Riley to come out with his hands up. Although they also yelled, "we're here to help," they again told him that if he had weapons "he would be shot."

46. Riley continued to yell from the bathroom, obviously agitated.

47. One of the defendant officers called for a "shield." The officers stood outside Riley's room for about three more minutes, during which time officers continued to cough.

48. About eight minutes after Officer 1 first kicked the door of Riley's room open, officers entered a fourth time, with approximately nine officers.

49. As they entered, multiple officers began coughing. At least two officers rushed out of the room.

50. Within about a minute of entering, officers carried Riley out of the room. He was completely limp and nonresponsive.

51. Officers placed Riley on the floor of the balcony walkway outside his room. They began performing CPR on Riley. Upon information and belief, officers could not find Riley's pulse when they began CPR.

52. Slightly more than two minutes later, Defendant officers stopped CPR.

They still could not find a pulse.

53. Upon information and belief, Defendant officers performed CPR improperly, stopped CPR too soon, and prevented paramedics from coming to the balcony where Riley lay for several minutes after it was safe to do so.

54. Defendant officers then carried Riley's limp body down the stairs and placed him on outer lane of Sunset Boulevard in front of the hotel. They also handcuffed him, even though he was obviously nonresponsive and the handcuffs interfered with the provision of CPR and other medical aid.

55. Paramedics examined Riley where he lay on the street. They reported encountering him asystole, or without a heartbeat. They drove Riley to Cedars Sinai emergency room, where doctors pronounced him dead at 6:13 a.m., less than ninety minutes after he called 911 for help.

56. At no point during the encounter did Riley threaten officers or any other people.

57. Riley behavior clearly indicated that he was afraid, agitated, and in need of help. But nothing indicated that he would harm officers or anyone else.

58. Upon information and belief, Defendants knew Riley was unarmed, because his friends told them. In the alternative, the Doe Defendants that Riley's friends told that he was unarmed failed to convey this vital information to other officers, despite knowing that such failure would dramatically increase the risks to Riley.

59. Upon information and belief, Defendants knew Riley was a good person who was suffering a mental health crisis, because his friends told them. In the alternative, the Doe Defendants that spoke with and observed Riley's friends and knew Riley suffering a mental health crisis failed to convey this vital information to other officers, despite knowing that such failure would dramatically increase the risks to Riley.

60. Upon information and belief, Defendants knew Riley's friends were present and had been talking with Riley through the window of the adjoining bathroom, where they could speak to him safely. Doe Defendants also spoke to (or know other Defendants

had spoken to) one of the 911 callers, who occupied that adjoining room and was awake and in the room.

61. Despite this knowledge, Doe Defendants nonetheless chose not to use de-escalation tactics or to engage with Riley or intervene in his mental health crisis, except in the aggressive manner alleged above.

62. Upon information and belief, at various points throughout the call, officers mentioned mental health calls and LAPD's specialized Mental Evaluation Unit, seemingly recognizing that Riley was suffering a mental health crisis and that their response should be employ appropriate techniques and resources for a mental health crisis, such as specialized engagement or de-escalation techniques, or a unit with specialized training or clinical resources. They nonetheless decided not to employ any such techniques, de-escalation, or resources.

**B. LAPD's Failures to Respond to Mental Health Crises**

63. LAPD has long history of unnecessarily escalating and using excessive force in responding to people in mental health crisis. Despite recent acknowledgment of these problems, and recognition of the need for alternatives to aggressive tactics by argument law enforcement, the City persists in failing to provide those alternative and responding to mental illness with aggressive techniques the escalate crises and lead to uses of force. These failures are longstanding and widely known and are the deliberate policy of the LAPD.

64. Public controversy over LAPD's responses to and use of force against people suffering mental illness goes back at least twenty-five years to the 1999 shooting of Margaret Mitchell. LAPD officers stopped the 102-pound Mitchell to investigate whether the shopping cart she was pushing might be stolen. When Mitchell waived a screwdriver at them, officers shot and killed her. The shooting provoked controversy and disagreement between policymakers and even rank-and-file officers, and the shooting called attention to LAPD's responses to people suffering mental illness.

65. The killings of Ezell Ford in 2014 and Charly "Africa" Leundeu Keunang

in 2015 both renewed public criticism of LAPD's response to people with mental illness. Both suffered mental illness — Ezell Ford's family maintained his mental impairment was known to officers, while officers shot Keunag while struggling with him near his tent in LA's Skid Row. The Department found that the officers who shot Keunang acted within policy and returned them to the field, although a jury later determined that they used excessive force.[1]

66. An analysis by the nonprofit news organization LAist in May 2024 found that since 2017, 31% of people shot at by LAPD officers were perceived by those officers to be struggling with mental illness.[2] In the article, then-Chief Michel Moore acknowledged that the Department's "SMART" Program (Systemwide Mental Assessment Response Team) that provided clinicians in response to mental health crises "was responding to 'less than a third' of mental health-related calls" and would require increasing the 19 clinicians in the program by 15-30 to meet needs.

67. In one recent and particularly clear indication of LAPD's problems, over the first three days of 2023, three people experiencing mental health crises died in encounters with LAPD.

68. On January 2, 2023, Shameka Smith called LAPD to report that her husband, Takar Smith, was experiencing a mental health crisis. She told the Department that he had been diagnosed with schizophrenia and sought to get him help. LAPD officers arrived at the apartment where Takar Smith was. He spoke unintelligibly. Officers tased him multiple times, then when he grabbed a kitchen knife, they shot and killed him.

69. The day after LAPD officers killed Takar Smith, on January 3, 2023,

---

[1] Vanessa Romo, *LA Approves $1.9 Million Settlement To Family Of Homeless Man Killed By LAPD*, NPR (Aug. 23, 2018), https://www.npr.org/2018/08/23/641074093/city-of-la-approves-1-9-million-settlement-to-family-of-homeless-man-killed-by-l [https://perma.cc/PQY4-GJAA].

[2] Robert Garrova, *Nearly a third of LAPD shootings since 2017 involved a person in a mental health crisis*, LAist (May 21, 2024), https://laist.com/news/criminal-justice/nearly-a-third-of-lapd-shootings-since-2017-involved-a-person-in-a-mental-health-crisis [https://perma.cc/LW2G-F62A]

officers encountered Keenan Andreson in Venice. Anderson was running in the street after being involved in a traffic collission. He appeared agitated and told officers that someone was trying to kill him. He tried to flee and begged for help as officers tased him multiple timesresulting in his death.

70. Also on January 3, 2023, LAPD officers shot and killed Oscar Leon Sanchez. Officers responded to a call that Sanchez allegedly threatened a driver with a knife, then located him at an abandoned home, where he displayed obvious signs of mental illness. Officers entered the room where Oscar was with a body shield. Officers reported that he stepped toward them "while holding a two-foot-long metal object with an approximate three-inch spike protruding from one end," at which point officers shot and killed him.

71. In the wake of the trio of January 2023 deaths, City leaders acknowledged serious concern over LAPD's handling of mental health crises and the need for response to mental health crises other than through police force. Mayor Karen Bass expressed "gave concerns" about the killings and said that "as a former health care professional, I am deeply troubled that mental health experts were not called in, even when there was a documented history of past mental health crisis. When there is no immediate risk to others, law enforcement must not be the first responder when someone is experiencing a mental health crisis. I believe officers and Angelenos agree on this."[3]

72. LA City Controller Kenneth Meijia also issued a statement, noting that "The killing of Takar Smith shows that LAPD filed to properly account for his mental health needs. LAPD was told clearly that he had a history of mental health needs, including a schizophrenia diagnosis. Despite this, officers failed to request any of the three then-available teams intended to help de-escalate encounters with people experiencing mental health crises." At least two City Council members, Eunisess

---

[3] Office of Mayor Karen Bass, *Mayor Karen Bass Statement On the Deaths of Takar Smith, Keenan Anderson & Oscar Sanchez* (Jan. 11, 2023), https://mayor.lacity.gov/news/mayor-karen-bass-statement-deaths-takar-smith-keenan-anderson-oscar-sanchez [https://perma.cc/5ZND-EWXV].

Hernandez and Hugo Soto-Martinez, also publicly called for improved responses to mental health crises to avoid LAPD use of force.[4]

73. Despite the recognition of the persistent problems with LAPD's response to mental health crises, the Department has left its policies and approaches unchanged.

74. On May 2, 2024, the family of Yong Yang called the Department of Mental Health to report that he was at their home experiencing a mental health crisis, and that he had been diagnosed with bipolar disorder. After a DMH clinician reported Yang responding violently, LAPD responded to the apartment, where Yang's father was outside telling them he needed to go to a hospital. Yang was alone in the apartment and refused to let officers in, telling them he had "already been killed multiple times." An officer then stated, "Alright, we're gonna have a use of force." Officers pushed their way into the apartment, where Yang was standing with a knife. Officers shot and killed him within 10 seconds of entering.[5]

75. In October 2025, Los Angeles City Controller Kenneth Mejia released an assessment of LAPD's Mental Evaluation Unit and SMART team program.[6] The report found that LAPD still "requires a patrol-first, armed response in mental health calls for service," an approach the limited the ability of mental health professionals to intervene and improve outcomes. It also found that even the "specially trained" MEU and SMART officers did not receive training beyond that available to all LAPD officers, that LAPD's training on mental health calls — LAPD's "Mental Health Intervention Training" — had little impact in reducing uses of force on people with mental illness, and that only 6% of

---

[4] Robert Garrova, *'He Just Needed Help' — Family Of Takar Smith Will Sue After Fatal LAPD Shooting*, LAist (Jan. 13, 2023), https://laist.com/news/criminal-justice/he-just-needed-help-family-of-takar-smith-will-sue-after-fatal-lapd-shooting [https://perma.cc/8WJU-R6KE].

[5] Robert Garrova, *A shooting in Koreatown*, LAist (June 12, 2024), https://laist.com/brief/news/la-family-county-clinicians-mental-health-crisis-still-ended-tragically [https://perma.cc/69FK-5JY2].

[6] *On the Sideline: Assessing LAPD's Mental Evaluation Unit a& SMART Co-Response Model*, Los Angeles City Controller (Oct. 27, 2025), available at https://controller.lacity.gov/meu.

incidents described an attempt to de-escalate.

76. The Controller's October 2025 report also found that "LAPD's policies lack in providing robust guidance to patrol response in mental health calls." It specifically found that "while the LAPD's policy acknowledges potential contacts with people with mental illness, it does little to provide specific direction on how to interact with and evaluate people with mental illness."

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION — Excessive Force
### Fourth and Fourteenth Amendments to the U.S. Constitution; 42 U.S.C. § 1983
### (Against Defendants City of Los Angeles and Does 1 to 16 and 21 to 35)

77. Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs in this Complaint.

78. Upon information and belief, Defendants Does 1 to 16 formulated and executed a plan to use tear gas or other chemical agent inside Riley's hotel room in an attempt to incapacitate Riley or coerce him into submission through pain or inability to breathe. Defendants knew that the use of force posed serious risks of harm or death.

79. Riley did not pose any threat to officers or others at the time they decided to use force, and Defendants had no reason to believe he did.

80. Riley also did not pose any threat of harm to himself. To the contrary, Riley had repeatedly expressed fear and called for help.

81. Upon information and belief, Defendants Does 21 to 25 participated in, approved, directed, acquiesced in, and ratified the decision and action of Defendant Does 1 to 16 to use tear gas or other chemical agents on Riley. These Defendants knew that Riley did not pose any threat to officers or others at the time, or to himself. They knew that the use of force posed serious risks of harm or death.

82. Upon information and belief, in deciding to use force in the form of tear gas or other chemical agent on Riley, Defendants Does 1 to 16 followed established the policies, practices, training and customs of the City of Los Angeles. These included, but are not limited to, regularly not calling the SMART team or other mental health

resources for mental health crises; prioritizing quick resolution of incidents through aggressive tactics, use of force, and command presence while disfavoring use of available tactics and resources to slow situations and de-escalate; not providing sufficient training and guidance to officers how to identify and respond to mental health crises; failing to provide adequate training on communicating with people in mental health resources; and failing to provide adequate training on the importance of gathering and communicating vital information related to a subject's mental health.

83. Upon information and belief, Defendants Does 26 to 35 established the policies, practices, training and customs of the City of Los Angeles that Defendants Does 1 to 16 followed in deciding to use force in the form of tear gas or other chemical agent on Riley.

84. As a direct and proximate result of Defendants' unconstitutional conduct, Riley Spicer suffered injuries and died.

85. Defendants' actions were malicious, oppressive, and in reckless disregard of Riley's constitutional rights, entitling Plaintiffs to punitive damages against the individual Defendants.

86. Plaintiffs are entitled to compensatory damages, punitive damages, attorney's fees, and costs pursuant to 42 U.S.C. § 1988.

**SECOND CAUSE OF ACTION — Loss of Right of Familial Association Fourteenth Amendment to the U.S. Constitution; 42 U.S.C. § 1983)**
**(Against all Defendants)**

87. Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs in this Complaint.

88. When the Defendants Does 1 to 16 and 21 to 25 formulated their plan to extract Riley, they were not in imminent danger and had the opportunity to consider their options and decide on a plan of action.

89. Officer Defendants disregarded known or obvious consequences of their actions, and acted with deliberate indifference to the risks to Riley.

90. Officers knew that their approach posed unjustifiable risks to Riley,

including their use of force, tear gas or other chemical irritants, smoke and/or breaching devices that posed substantial risk of serious harm or death to Riley; their use of aggressive tactics and threats that they knew would escalate the situation rather than calm it, increasing risks to Riley who they knew was already agitated; their refusal to use de-escalation tactics including speaking with Riley without entering the room.

91. Upon information and belief, Defendants Does 21 to 25 participated in, approved, directed, acquiesced in, and ratified the decision and action of Defendant Does 1 to 16 in how to respond to Riley. These Defendants knew the risks these actions posed to Riley.

92. Upon information and belief, the conduct of Defendants Does 1 to 16 followed established the policies, practices, training and customs of the City of Los Angeles. These included, but are not limited to, regularly not calling the SMART team or other mental health resources for mental health crises; prioritizing quick resolution of incidents through aggressive tactics, use of force, and command presence while disfavoring use of available tactics and resources to slow situations and de-escalate; not providing sufficient training and guidance to officers how to identify and respond to mental health crises; failing to provide adequate training on communicating with people in mental health resources; and failing to provide adequate training on the importance of gathering and communicating vital information related to a subject's mental health.

93. Upon information and belief, Defendants Does 26 to 35 established the policies, practices, training and customs of the City of Los Angeles that Defendants Does 1 to 16 followed in their acts alleged herein.

94. Upon information and belief, Defendants Does 1 to 20 who failed to gather or pass on vital information the situation to other responding officers, including but not limited information about Riley's mental health status and the fact that he was not armed, knew that these failures posed serious risks to Riley.

95. Defendants denied Riley adequate psychiatric and medical care, including but not limited to by refusing to allow paramedics to access him as soon as he left the

room and by ceasing CPR prematurely.

96. As a direct and proximate result of Defendants' unconstitutional conduct, Riley Spicer suffered injuries and died.

97. Defendants' actions were malicious, oppressive, and in reckless disregard of Riley's constitutional rights, entitling Plaintiffs to punitive damages against the individual Defendants.

98. Defendants' actions shock the conscience.

99. Plaintiffs are entitled to compensatory damages, punitive damages, attorney's fees, and costs pursuant to 42 U.S.C. § 1988.

**THIRD CAUSE OF ACTION — Wrongful Death**
**Cal. Code of Civil Procedure § 377.60 *et seq.***
**(Against all Defendants)**

100. Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs in this Complaint.

101. Plaintiffs allege all California state law claims as basis for state law wrongful death cause of action and incorporate later torts by reference.

102. Defendants' wrongful acts alleged herein resulted in the death of Riley Spicer. Specifically, Defendants' unlawful use of force in violation of the U.S. and California constitutions and the California Penal Code, their denial of Riley's due process rights in violation of the laws and Constitution of the United States and California, the refusal to provide or summon prompt psychiatric or medical case.

103. Riley required prompt medical attention from Defendants. Defendants had actual knowledge of Riley's need for emergency medical services and deliberately chose to not furnish care.

104. As a direct and proximate result of Defendants' acts and omissions, described herein, Riley died, and experienced pain and suffering before his death, as set forth above.

105. The City of Los Angeles is also responsible for the acts of individual and Doe Defendants under the theory of *respondeat superior*.

106. The wrongful acts alleged above caused Riley's death and have legally, proximately, foreseeably and actually caused severe emotional damages, including the loss of society, companionship, emotional distress, and further economic and non-economic damages according to proof at the time of trial.

**FOURTH CAUSE OF ACTION — Negligence**
**(Against all Defendants)**

107. Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs in this Complaint.

108. All Defendants had a duty to Riley Spicer to act with ordinary care and prudence so as not to cause harm or injury to another.

109. Defendants knew Riley was suffering a mental health crisis and needed urgent medical care. They improperly, negligently, wrongfully, and recklessly used tactics they knew would escalate and exacerbate a mental health crisis, including the use of chemical agents and/or a breaching device, and did not use tactics that would de-escalate the situation. Defendants improperly, negligently, wrongfully, and recklessly failed to provide care for Riley.

110. By their presence, Defendants also prevented the intervention of other people, thereby increasing the danger of harm, and creating a special relationship requiring them to protect Riley.

111. Government Code section 815.2, subdivision (a), provides that a public entity is liable for injury proximately caused by an act or omission of an employee of the entity within the scope of her employment, if the act or omission would, apart from the section, have given rise to a cause of action against the employee.

112. Doe Defendants' decisions with regard to Riley do not fall within the discretionary immunity of Government Code section 820.2 because they were neither carefully balanced basic policy decisions nor planning (as opposed to operational) decisions.

113. The City is responsible for the act of individuals and Doe Defendants under

the theory of *respondeat superior*.

114. By engaging in the acts alleged herein, all defendants failed to act with ordinary care and breached their duty of care owed to Riley.

115. As a direct and proximate result of the aforementioned acts and omissions of Defendants, Plaintiff suffered damages in an amount to be established at trial.

**FIFTH CAUSE OF ACTION — Bane Act**

**Cal. Civil Code § 52.1**

**(Against All Defendants)**

116. Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs in this Complaint.

117. Plaintiff brings the claims in this cause of action as survival claims permissible under California law, including Cal. Code of Civ. Proc. §§ 377.20 *et. seq*.

118. By their acts, omissions, customs, and policies, each Defendant acting in concert, as described above, by threat, intimidation, or coercion, interfered with, attempted to interfere with, and violated Riley's rights secured by the Constitution or laws of the United States, and the Constitution and laws of the State of California:

a. The right to be free from excessive force as secured by the Fourth Amendment to the Constitution; Article I, § 13 of the California Constitution; and California Penal Code including section 835a.

b. The right to be free from objectively unreasonable treatment and deliberate indifference to Riley Spicers's serious medical needs as secured by the Fourteenth Amendment to the United States Constitution and by California Constitution, Article I, § 7;

c. The right to enjoy and defend life and liberty; acquire, possess, and protect property; and pursue and obtain safety, happiness, and privacy, as secured by the California Constitution, Article 1, § 1;

d. The right to protection from bodily restraint, harm, or personal insult, as secured by California Civil Code § 43;

e. The right to participation in and benefits of the services, programs, or activities of a public entity, without discrimination, under the Americans with Disabilities Act, 42 U.S.C. § 12132;

f. The right to participation in and the benefits of any program or activity receiving federal financial assistance, without discrimination, under the Rehabilitation Act, 29 U.S.C. § 794.

119. In their conduct alleged above, Defendants intended to deprive Riley of the enjoyment of the interests protects by the rights above, or acted with reckless disregard for Riley's enjoyment of the interests protected by those rights.

120. As a direct and proximate result of the aforementioned acts or omissions of Defendants, Plaintiff suffered damages in an amount to be established at trial.

121. Defendants' conduct was a substantial factor in causing harm to Riley.

122. In their conduct alleged above, Defendants acted with reckless and callous disregard for Riley Spicer's rights under the laws and constitutions of the United States and California. The wrongful acts, and each of them, were willful, oppressive, fraudulent and malicious, thus warranting the imposition of punitive damages against Defendants in an amount adequate to punish the wrongdoers and deter future misconduct.

**SIXTH CAUSE OF ACTION — Americans with Disabilities Act**

**42 U.S.C. § 12131 – Violation of Title II of the Americans with Disabilities Act**

**(Against Defendant City of Los Angeles)**

123. Plaintiff realleges and incorporates by reference the allegations of all preceding and subsequent paragraphs as though set forth in full herein.

124. Congress enacted the Americans With Disabilities Act ("ADA") upon finding, among other things, that "society has tended to isolate and segregate individuals with disabilities" and that such forms for discrimination continue to be a "serious and pervasive social problem." 42 U.S.C. §12101(a)(2).

125. In response to these findings, Congress explicitly stated that the purpose of the ADA is to provide "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1)-(2).

126. Title II of the ADA provides in pertinent part: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or

be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

127. The U.S. Department of Justice has implemented regulations at Title II, 28 C.F.R. § 35.160, which require public entities to take appropriate steps to ensure that communications with members of the public with disabilities are as effective as communications with others.

128. At all times relevant to this action, Defendant City of Los Angeles was a public entity within the meaning of Title II of the ADA and provided programs, services, and activities to the general public.

129. At all times relevant to this action, Riley was a "qualified individual with a disability" as defined under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131(2), in that he suffers from bipolar disorder, a mental impairment that substantially limits a major life activity. *See* 29 C.F.R. § 1630.2(j)(3)(iii).

130. The U.S. Department of Justice, Civil Rights Division, Disability Rights section has published, "Commonly Asked Questions About the Americans with Disabilities Act and Law Enforcement," a document in which the U.S. Department of Justice provides guidelines in the interpretation of Title II of the ADA (the Guidelines). In the Guidelines, the Department of Justice notes that the ADA affects virtually everything that police officers do, including providing emergency medical services, arresting, booking, and holding suspects, and other duties.

131. Doe Defendants 1 to 25 were made aware of Riley's disability by 911 calls that indicated that Riley was having a psychotic episode.

132. On information and belief, Doe Defendants 1 to 25 were also made aware of Riley's disability by observing his behavior when they arrived at the hotel, which was clearly a psychotic episode.

133. During their encounter with Riley, Defendants 1 to 25 failed to reasonably accommodate Riley's disability, using threats and commands that they knew he would, by reason of his disability, perceive as threatening and would be unable to respond to,

and by interpreting his behavior as threatening and volitional when it was neither, causing him to suffer greater injury in that process than other non-disabled persons would.

134. Through the acts and omissions of Defendant City of Los Angeles and its agents and employees described herein, the City violated Title II of the ADA by excluding Riley from participation in, by denying him the benefits of, and subjecting him to discrimination in the benefits and services it provides to the general public.

135. Plaintiff is informed, believes, and thereon alleges that Defendant City and its agents and employees have failed and continue to fail to take into account and provide reasonable accommodations for persons suffering from bipolar disorder and other brain function conditions that can cause mental health conditions episodes by failing to, among other things:

a. Adopt and enforce policies and procedures for communicating effectively, controlling, and interacting with persons experiencing mental health crises due to bipolar disorder and similar conditions;
b. Adopt and enforce policies and procedures for providing persons experiencing mental health crises due to bipolar disorder and similar conditions access to medical facilities, including the provision of employees with training and resources to communicate, interact with, calm, and control such persons;
c. Train and supervise LAPD officers to communicate effectively, control, interact with, and safely de-escalate encounters persons experiencing mental health crises due to bipolar disorder and similar conditions;
d. Train and supervise LAPD officers regarding the cognition and behavior of persons experiencing mental health crises due to bipolar disorder and similar conditions; and
e. Train and supervise LAPD officers to de-escalate and not use force on persons experiencing mental health crises due to bipolar disorder and similar conditions.

136. The foregoing wrongful acts and failures to act of Defendant City seriously injured Plaintiffs. As a direct and proximate result of these actions and omissions, Plaintiffs suffered damages including physical pain, emotional distress, humiliation, reputational harm, loss of income, and continuing anxiety and trauma regarding interactions with law enforcement.

137. Pursuant to 42 U.S.C. § 12133, Plaintiffs are entitled to recover the compensatory damages described herein, and reasonable attorneys' fees and costs incurred in bringing this action.

**SEVENTH CAUSE OF ACTION — Rehabilitation Act**

**29 U.S.C. § 794 – Violation of the Rehabilitation Act**

**(Against Defendant City of Los Angeles)**

138. Plaintiffs reallege and incorporate by reference the allegations of all preceding paragraphs as though set forth in full herein.

139. Section 504 of the Rehabilitation Act of 1973 provides in pertinent part: "[N]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits, or be subjected to discrimination under any program or activity receiving federal financial assistance." 29 U.S.C. § 794.

140. Riley Spicer, at all times relevant herein, is and has been a qualified individual with a disability within the meaning of the Rehabilitation Act because he suffers from bipolar disorder, an impairment that substantially limits a major life activity, namely, brain function. *See* 29 U.S.C. § 705(20)(B); 29 C.F.R. § 1630.2(j)(3)(iii).

141. At all times relevant to this action Defendant City of Los Angeles was a recipient of Federal funding within the meaning of the Rehabilitation Act.

142. Through its acts and omissions described herein, Defendant City of Los Angeles has violated the Rehabilitation Act, including all applicable implementing regulations, by excluding Riley from participation in, denying him the benefits of, and

subjecting him to discrimination in the benefits and services it provides to the general public.

143. The foregoing wrongful acts and failures to act of Defendant City of Los Angeles seriously injured Plaintiffs. As a direct and proximate result of these actions and omissions, Plaintiffs suffered damages including physical pain, emotional distress, humiliation, reputational harm, loss of income, and continuing anxiety and trauma regarding interactions with law enforcement.

144. Pursuant to 29 U.S.C. § 794(a), Plaintiffs are entitled to recover the damages described in this Complaint and reasonable attorneys' fees and costs incurred in bringing this action.

## REQUEST FOR RELIEF

Wherefore, Plaintiffs seek judgment as follows:

1. An award of general and special damages according to proof at time of trial;
2. Punitive damages in an amount sufficient to punish and deter;
3. An award of attorneys' fees pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 12133, Cal. Civil Code §§ 52(b) & 52.1(h), Cal. Code of Civ. Proc. § 1021.5, and other applicable statutes and ordinances;
4. Costs of suit;
5. Pre- and post-judgment interest as permitted by law;
6. Such additional relief as the Court deems proper and just.

## DEMAND FOR JURY TRIAL

Pursuant to the Seventh Amendment of the U.S. Constitution and Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury.

Dated: December 31, 2025

Respectfully submitted,

LAW OFFICE OF PETER BIBRING

By: ______________________
Peter Bibring

*Attorney for Plaintiff*